Jonathan W. Katchen, AK Bar No. 0411111
Talitha Birch Kindred, AK Bar No. 0711079
HOLLAND & HART LLP
1029 W. Third Avenue, Suite 550
Anchorage, Alaska 99501
Telephone: (907) 865-2600
Fax: (907) 865-2680
JWKatchen@hollandhart.com
TBKindred@hollandhart.com

*Attorneys for Plaintiff Quintillion Networks, LLC*

---

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF ALASKA

| | |
|---|---|
| QUINTILLION NETWORKS, LLC,<br><br>　　　　Plaintiff,<br><br>vs.<br><br>IRONSHORE SPECIALTY INSURANCE COMPANY,<br><br>　　　　Defendant. | Case No. 3:19-cv-_____ |

## **COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff Quintillion Networks, LLC, ("Quintillion") for its complaint in this matter against Ironshore Specialty Insurance Company ("Ironshore") states the following:

## **PARTIES**

1.　　　Quintillion is an Alaska limited liability company, with its principal place of business in Anchorage, Alaska.

2.    Ironshore is incorporated in the State of Arizona with its principal place of business in Scottsdale, Arizona, and is licensed by the Alaska Division of Insurance to write insurance in the State of Alaska.

## JURISDICTION AND VENUE

3.    There currently exists a substantial controversy between the parties as to the respective rights and obligations under the insurance policy issued by Ironshore to Quintillion.  This Court's declaration is necessary to establish the respective rights and obligations of the parties.  Accordingly, this Court has jurisdiction over the parties and this controversy under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201.

4.    The Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the controversy is between citizens of different states and the amount in controversy exceeds $75,000.

5.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because the property that is the subject of the action is situated, and the events or omissions giving rise to the claims occurred, in Alaska.

## GENERAL ALLEGATIONS

### I.    The Quintillion Installation Project

6.    This is an insurance coverage case involving a denial of coverage by Ironshore to Quintillion.

7.    The case arises out of a construction project performed by Quintillion, through its prime contractor New Horizons Telecom, Inc. ("NHTI"), involving

construction of a terrestrial fiber optic cable system between Deadhorse, Alaska and Coldfoot, Alaska, (the "Quintillion Installation Project" or "Project") in the right-of-way adjacent to the Dalton Highway.

8. On or about April 24, 2015, the State of Alaska, Department of Transportation and Public Facilities ("DOT") issued Quintillion a Utility Permit, which granted Quintillion a property interest and the right to construct and operate the Quintillion Installation in the DOT right-of-way adjacent to the Dalton Highway.

9. On or about October 23, 2015, the Bureau of Land Management ("BLM") granted Quintillion a right-of-way to construct and operate the Quintillion Installation in federally-managed lands adjacent to the Dalton Highway between Coldfoot and Slope Mountain.

10. Quintillion's Utility Permit, issued by Alaska DOT, required that it construct the Quintillion Installation Project in compliance with DOT's minimum design standards and requirements which included:

   a. The installation of two 1.25-inch conduits, one to carry cable and one for spare.

   b. Burial of conduit a minimum of 48 or 36 inches below ground, depending on location.

II. **The Ironshore Builder's Risk Policy**

11. Prior to commencing construction on the Project, Quintillion purchased from Ironshore a Builders Risk Policy ("Policy"), Number 002769300, policy period

COMPLAINT AND DEMAND FOR JURY TRIAL
*Quintillion Networks, LLC v. Ironshore Specialty Insurance Co.*
Page 3 of 39

May 04, 2016 to November 15, 2017, which was later extended to February 15, 2018, for which it paid $48,000.

12.   Builder's Risk is "[a] property insurance policy that is designed to cover property in the course of construction. . . . [T]he estimated completed value of the project is used as the limit of insurance." *See* International Risk Management Institute, Inc. ("IRMI"), www.irmi.com/term/insurance-definitions/builders-risk-policy.

13.   Ironshore markets its Builder's Risk program as uniquely responsive to businesses across a wide spectrum of industry- and project-types, with a depth of expertise in providing its insureds with customized policies intended to cover a company's individualized risks, utilizing the following material from its website:

> The construction industry is prone to volatility and risk. Financial pressures and liabilities can be immense. Since no two projects are alike, their insurance strategies should be equally customized. From small general contracting jobs to large-scale developments, Ironshore's construction unit has the leadership and knowledge to understand market indicators and properly protect your business for sustained growth.

> **Builders Risk**                                                                        ⊕
>
> Ironshore's Builders Risk program provides comprehensive coverage for construction projects including hot testing and delay in completion. Coverage is available for both domestic and international locations with terms up to 60 months. Coverage for completed toll roads and bridges is also available.

http://www.ironshore.com/construction/ci64 (last visited 2/7/2019).

> Builder's Risk Property products provide property risk transfer solutions for global and domestic corporations with international and domestic capabilities. Property coverage is provided for project builders' risk programs utilizing broker forms or our Completed Value Builders Risk Policy which provides coverage for property in the course of construction including hot testing and delay in completion coverage, and includes both principals and contractors.
>
> A five year construction term is offered. Ironshore underwrites the construction of civil engineering projects such as roads, bridges, tunnels, water treatment plants and buildings, as well as mechanical engineering projects for oil and petrochemical facilities, utilities and heavy manufacturing plants. Coverage will be provided for the construction work period, including the installation, assembly, erection, testing and commissioning of plant and machinery. Delay in start-up and phased operation coverages are also available from Ironshore.

http://www.ironshore.com/usa/property/c41 (last visited 2/7/2019).

COMPLAINT AND DEMAND FOR JURY TRIAL
*Quintillion Networks, LLC v. Ironshore Specialty Insurance Co.*
Page 4 of 39

14. As Ironshore's statements acknowledge, there can be significant volatility and risk involved with construction projects, and nowhere is this more palpable than in Alaska. Operating in the Arctic is precarious: conditions can be brutal, and projects often encounter numerous problems caused by the harsh environment. Quintillion purchased the Ironshore policy because it needed the type of insurance program Ironshore offered; that is, a program tailored to the unique exposures this Project would encounter due to the harsh environment and extremes caused by weather, erosion, water damage, and other unforeseen events.

15. The Ironshore Policy states: "This Policy Limit shall be $25,326,531 in any one OCCURRENCE* . . ." Exhibit A at 7. The Policy defines OCCURRENCE* generally as "an accident, incident, or a series of accidents or incidents arising immediately out of a single event or originating cause and includes all resultant or concomitant losses wherever located." Exhibit A at 24.

16. The Policy's total coverage limit of $25,326,531.00 is the same value as the Estimated TOTAL CONTRACT VALUE* of the INSURED PROJECT* declared to the Insurer by the Named Insured at Policy Inception, which is found in Section I-9 of the Policy. Exhibit A at 7.

17. The Policy defines TOTAL CONTRACT VALUE* as the "total value of all property insured including, but not limited to, all wages, expenses, materials, supplies, equipment, existing structures (when coverage is included) and such other charges, all

whether provided by the owner, contractors or others, which will become a part of or will be expended in the project . . . ." Exhibit A at 25.

18.     The Ironshore Policy identifies the insured property that is located at the insured project site as:

> Permanent works - All materials, supplies, equipment, machinery, and other property of a similar nature, being property of the Insured or of others for which the Insured may be contractually responsible, the value of which has been included in the estimated value of the INSURED PROJECT* in Section I-9., all when used or to be used in or incidental to the demolition of existing structures, site preparation, fabrication or assembly, installation or erection or the construction of or alteration, renovation, rehabilitation of the INSURED PROJECT* in Section I-9.

Exhibit A at 9-10.

19.     The Ironshore Policy's "Insuring Agreement" states: "This Policy . . . insures against all risks of direct physical loss of or damage to property insured while at the location of the INSURED PROJECT*, while in offsite temporary storage or while in transit, all within the Policy territory and occurring during the Policy Period." Exhibit A at 9.

20.     The Ironshore Policy defines "INSURED PROJECT*" to mean the "work which is being performed in accordance with the contract documents being more fully described and located as set forth in Section I-6 and Section I-7." *Id* at 24.

21.     Policy Section I-6 and I-7 address, respectively, the location of the insured project and the description of the insured project, and together provide the following

information:  the "Dalton HWY Fiber Optic Cable Project," extends along "Dalton Hwy from Coldfoot, Alaska to Prudhoe Bay, Alaska," for "240 miles in length," and involves the installation of "approximately 240 miles of fiber in conduit as well as three communication and generator shelters. The conduit is to be placed approximately 36-42-inches in depth."  Exhibit A at 6.

22.    On March 30, 2016, Quintillion, through its broker Aon, submitted to Ironshore a "quote request" (the "Submission") that asked Ironshore to propose and price Builder's Risk coverage for the Quintillion Installation Project. *See* Exhibit B, email from Evan Tassan, Aon Risk Solutions, to Daniel Owen, SVP-Builder's Risk/Energy Property, Ironshore Management, Inc. dated March 30, 2016.

23.    The Submission included the following information concerning the Project:

> NHTI will install two high-density polyethylene (HDPE) 1.25 inch conduits in the ground 36 inches deep.  Installation methods for the conduits will use standard plow methods or a combination of trenching, boring, rock excavation and plowing methods dependent upon the terrain.  Conduit joints will be mechanically connected and protected with water proofing along the course of the route at the locations shown in the design drawings.  Conduits are plugged to prevent debris and water from entering while awaiting the next phase of installation. . . .  Construction work will depend primarily on safety and ground conditions . . .

Exhibit B at 2.

24.    The following equipment/machinery was identified in the Submission to be used in the course of Project construction:

- Vermeer Trencher RTX1250

- John Deer WLT 850 Dozer with 2014 BRON Vibratory Plow
- CAT D8T Dozer with 2015 BRON Vibratory Plow
- Pneumatic Superjet Fiber blowing machine
- Vermeer 18x22 Directional Drill
- Vermeer 9/13 Directional Drill
- Astec 4045 Directional Drill
- Vermeer 36x50 Directional Drill
- Vermeer 100x140 Directional Drill
- Vermeer 36x50 II Directional Drill
- Kubota KX-121-3 Mini Excavator
- Kubota KX-121-3 Mini Excavator
- Kubota KX-121-3 Mini Excavator
- Hitachi ZX200LC
- Case CX27B Mini Excavator
- Cat D8T 2013 MLN01717
- Kubota KX057-4 25781
- Case Backhoe Super
- Caterpillar 312EL Hydraulic Excavator
- Hitachi ZX85USB- Excavator
- Vermeer RTX1250 Tilt Tractor/Trencher

*See* Exhibit B at 2.

25.    The Submission contained information about construction plans and methods related to the Quintillion Installation Project.

26.    The Builder's Risk Policy Ironshore offered Quintillion, and Quintillion purchased, was prepared based on the information contained in the Submission.

27.    The Submission contained the following information: "NHTI will install . . . . conduits in the ground 36 inches deep.  Installation methods for the conduits will use standard plow methods or a combination of trenching, boring, rock excavation and plowing methods . . .  Construction work will depend primarily on . . . ground conditions . . . ."

COMPLAINT AND DEMAND FOR JURY TRIAL
*Quintillion Networks, LLC v. Ironshore Specialty Insurance Co.*
Page 8 of 39

28. Statements in the Submission such as: conduits will be installed "in the ground 36 inches deep" and installation will require construction methods involving "trenching, boring, rock excavation and plowing" clearly communicated that the Project centered around excavation, which means digging and moving earth. *See* https://dictionary.cambridge.org/us/dictionary/english/excavation (Excavation means "the act of digging a hole or channel in the ground, especially with a machine"). Cambridge Dictionary Online (last visited 2/7/2019).

29. The Submission, upon which Ironshore relied to write the Builder's Risk coverage it offered Quintillion, was replete with information emphasizing that a primary component of the INSURED PROJECT* involved excavation – digging and moving earth – and burial of the cable 36 inches deep in the ground – again involving moving earth to backfill the trench in order to bury the cable to depth. Backfill means "to refill (something, such as an excavation) usually with excavated material." *See* www.merriam-webster.com/dictionary/backfill. Merriam-Webster Dictionary Online (last visited 2/7/2019).

30. The list of equipment identified for use during the course of construction also demonstrated that digging and moving earth was a major Project undertaking – since digging and moving earth is a primary function of excavators, trenchers, dozers, plows and/or backhoes.

31. The Submission described the scope of the Quintillion Installation Project to include (1) excavation (digging and moving earth) to create a 240 mile-long, 36-48

COMPLAINT AND DEMAND FOR JURY TRIAL
*Quintillion Networks, LLC v. Ironshore Specialty Insurance Co.*
Page 9 of 39

inch-deep trench in the right-of-way adjacent to Dalton Highway; (2) placement of fiber in conduit ("cable") in the trench; and (3) burying the cable 36 – 48 inches below ground by moving earth to backfill the trench in which the cable was placed, as required by the DOT permit.

III.     **The Property Damage caused by Bortek/UTI**

32.     Upon information and belief, in or around 2015, DOT issued Bortek, LLC ("Bortek"), a Utility Permit, which granted Bortek the right to construct a buried fiber optic cable system between Deadhorse, Alaska and Coldfoot, Alaska (the "Bortek Installation").

33.     Bortek was a subsidiary of GCI, LLC ("GCI") an Alaska-based diversified communications company.

34.     Utility Technologies Incorporated, ("UTI"), was engaged to construct the portion of the Bortek Installation between approximately Dalton Highway mileposts 299 and 360 (the "Subject Property").

35.     After the Quintillion Installation was completed in the Subject Property, the Bortek Installation was constructed in the same right-of-way adjacent to the Dalton Highway, approximately five feet from the Quintillion Installation.

36.     Upon information and belief, Bortek's Utility Permit required that it construct the Bortek Installation in compliance with DOT's minimum design standards and requirements, which included:

COMPLAINT AND DEMAND FOR JURY TRIAL
*Quintillion Networks, LLC v. Ironshore Specialty Insurance Co.*
Page 10 of 39

a. The installation of two 1.25-inch conduits, one to carry cable and one for spare.

b. Burial of conduit a minimum of 48 or 36 inches below ground, depending on location.

c. Placement of fiber optic utility five feet apart from the Quintillion Installation.

37. Upon information and belief, Bortek's Utility Permit provides that Bortek is subject to all previous "Utility Permits and any damage to any other utility will be [Bortek's] responsibility."

38. Upon information and belief, UTI began constructing the Bortek Installation in the Subject Property in or about June 2016. Construction of the Bortek Installation in the Subject Property was completed in the summer of 2017.

39. At multiple locations during construction in the Subject Property, UTI excavated groundcover and soil from the Quintillion Installation, thereby creating a trench, and placed the groundcover and soil from the Quintillion Installation on top of the Bortek Installation, thereby creating a mound ("Mounding").

40. Evidence of Mounding, as shown in the photograph below, is concentrated between Dalton Highway mileposts 299 and 360 - the Subject Property - which is the segment of the Bortek Installation that UTI constructed.



41.     UTI's construction activities severely damaged areas of the  Project after Quintillion had finished its installation work at the Subject Property.

42.     After (1) excavating to create the trench, and (2) installing the cable in the trench, Quintillion's Project construction included (3) committing significant resources, *i.e.,* labor, equipment and materials, to backfilling the trench to create an earthen barrier

to protect the cable by insulating it from harsh environmental conditions, shielding the cable from destructive forces produced by vehicles, animals, people, rocks and other animate and inanimate objects, stabilizing the cable to prevent movement that could cause breaches in the conduit or disruptions in the fiber optic connections, and complying with DOT's 36 – 48 inch burial requirement. UTI's construction activities damaged this component of the Project.

43.     The Policy contains a provision requiring policyholders to take steps to protect the insured property from potential damage:

> 7.     <u>PROTECTION OF PROPERTY</u>
>
> The Insured will take reasonable steps to protect, recover or save the property insured and minimize any further or potential loss or damage when:
>
> A. The property insured has sustained direct physical loss or damage by an insured peril;

Exhibit A at 17.

44.     UTI's excavation from Quintillion's Installation resulted in destruction of the earthen barrier that provided protection and insulation for the cable.

45.     UTI's excavation from the Quintillion Installation reduced the burial depth of the cable below the required 36 inches and subjected it to far greater risk of damage from external forces, temperature extremes and environmental exposures such as wind, weather, water, erosion and other unforeseen circumstances and events.

46.     UTI's excavation from Quintillion's Installation also led to exposure of the subsurface layer of soil that typically remains frozen throughout the year, resulting in thawing of the permafrost and destabilization of the subsurface soil.  Because of thawing and destabilization, water collected over and flowed around the Quintillion Installation, which led to erosion and thawing of deeper layers of permafrost and further destruction of the protective earthen barrier.

47.     Creation of an above-grade mound over the Bortek Installation compounded the damage to the Quintillion Installation by diverting additional water into the trench that UTI excavated over the Quintillion Installation.

48.     Absent remediation, the problems resulting from UTI's excavation and Mounding will continue to cause degradation to the Quintillion Installation due to  wind, weather, water, erosion and exposure to external forces.

49.     Quintillion has requested that Bortek, UTI and GCI remediate the damage caused to the Quintillion Installation from UTI's construction practices, or provide a plan to do so, but none of these entities has agreed to remediate the damage or to provide an acceptable plan.

50.     Ironshore's Builder's Risk policy is an "all risk" policy, as established by its insuring agreement: "[t]his Policy . . . insures against all risks of direct physical loss of or damage . . . ." that covers OCCURRENCES,* which include accidents or incidents involving a variety of natural and man-made events.  Exhibit A at 9.

IV.  **Damage Caused by Flooding & Earth Movement**

51.  The Policy defines "Flood" as

A.  A general and temporary condition of partial or complete inundation of normally dry land areas, including dewatered areas, from:

1. The overflow of inland or tidal waters;
2. The unusual and rapid accumulation or runoff of surface water;
3. Tsunami;

B.  . . .

C.  Surface water being seepage, leakage or influx of water (immediately derived from natural sources) . . . ; and shall also include all water which backs up through sewers and drains;

D.  The collapse or subsidence of land along the shore of a lake or other body of water as a result of erosion or undermining caused by waves or currents of water exceeding the cyclical levels which result in flooding as defined in Section V-5.A. above;

Exhibit A at 24.

52.  A culvert is a drain. https://en.wikipedia.org/wiki/Culvert ("A culvert is a structure that allows water to flow under a road, railroad, trail, or similar obstruction from one side to the other side.")

53.  Portions of the Quintillion Installation were damaged due to flooding on or after May 4, 2016.

54.  For example, near Dalton Highway MP 208, portions of the Project were damaged when heavy rainfall resulted in the unusual and rapid accumulation of water in

Brockman Creek, causing the Creek to overflow its banks, which inundated the Project installation in that area. The flooding at Brockman Creek was exacerbated because DOT, which is charged with ensuring culverts are free from blockage, did not clear the Brockman Creek culvert, which was blocked by ice. Consequently, the flooding at Brockman Creek was not diverted through the culvert to the west side of Dalton Highway. Instead, the flooding Creek waters inundated the east side of Dalton Highway, which resulted in scouring groundcover and backfill from the Quintillion Installation.

55.     The loss of groundcover and backfill from flooding diminished the protective earthen barrier installed over the cable, leaving the subsurface permafrost ice lense exposed to warmer air and water temperatures, which resulted in melting of the ice and further inundation of the area on top of and surrounding the cable.

56.     This process reduced the burial depth of the cable below the required 36 inches and subjected it to far greater risk of damage from external forces, temperature extremes and environmental exposures such as wind, weather, water, erosion and other unforeseen circumstances and events.

57.     The photograph below shows an example of the flood damage to the Project.



58.     The photograph below shows the same area after repair work was done.



59.     The Policy defines "Earth Movement" as:

> Any natural or man-made earth movement, including
> but not limited to earthquake, shocks, tremors,
> volcanic action, earth rising or shifting, landslide,
> subsidence, sinkhole and rockfall.

Exhibit A at 23.

60.     Portions of the Quintillion Installation were damaged by subsidence on or after May 4, 2016. The earth movement in some areas was caused by excess water flow, which led to erosion and subsidence.

61.     In other areas, the earth movement and subsidence was the product of Subsidence in other areas was caused. Other impacted areas were caused by fluvio-thermal erosion, also known as karsting.

62.     Fluvio-thermal erosion is a combination of thermal and mechanical erosion. The melting of subsurface ice creates a void, which causes the collapse of the surrounding surface area. Hydraulic forces contribute to the erosion as subsurface water thaws ice-rich sediment.

63.     The photograph below shows an area impacted by earth movement and subsidence.



64.     The remedial work Quintillion undertook to repair the damage caused by flooding and earth movement was necessary to return the Project to its previous condition as insured under the Policy by the $25,326,531 TOTAL CONTRACT VALUE* covering the "total value of all property insured including, but not limited to, all wages, expenses, materials, supplies, equipment . . . and such other charges . . .which will be expended in the project."  Exhibit A at 25.

V.     <u>**Ironshore's Denial of Quintillion's Flood and Earth Movement Claim**</u>

65.     On February 21, 2017, Quintillion provided Ironshore with a notice of circumstances regarding the property damage caused by the earth movement and flooding (the "Flood claim").

66.     On February 24, 2017, Ironshore acknowledged receipt of Quintillion's notice of circumstances, identifying Christopher J. Kelly, Vice President of Property

Claims for Ironshore Insurance Services, LLC, as the "Claims Professional [who] has been assigned to this matter for further handling."

67.    On March 8, 2017, Vericlaim, a third-party claim adjuster/administrator (TPA) that handles claims for Ironshore, contacted Quintillion to say that Geo Group Northwest, a civil engineering consultant, would be investigating the Flood claim, and to provide Quintillion with Geo Group's information requests.

68.    On March 13, 2017, Quintillion responded, providing Vericlaim with the NHTI contract and change orders, as requested by Geo Group.

69.    Alaska regulations require insurance companies to "promptly undertake the investigation of a claim [] and shall complete the investigation within 30 working days, unless the investigation cannot reasonably be completed using due diligence." If additional time is needed, insurance companies must "give written notification to the claimant that specifically states the need and reasons for additional investigative time and also specifies the additional time required to complete the investigation [which] shall be given no later than the 30th working day after notification of the claim is first received." 3 AAC § 26.050(a)-(b)

70.    Ironshore failed to complete its investigation within 30 working days of receipt of the Flood claim and failed to give written notice to Quintillion that specifically stated the reasons it needed additional investigative time or the amount of additional time it believed would be required to complete the investigation.

71.     On January 16, 2018, Quintillion hosted a meeting with Vericlaim and Geo Group Northwest and provided detailed information regarding the Flood claim, including an estimate of the cost to repair the damage to the Project.

72.     In an email dated January 16, 2018, Quintillion provided duplicate copies of the NHTI construction contract, which had been requested by Vericlaim during the meeting, despite that Vericlaim previously requested and received a copy of the NHTI contract in March 2017.

73.     Quintillion received no communication from Ironshore or Vericlaim for two months after the January 2018 meeting.

74.     On March 14, 2018 Vericlaim sent a request for information regarding the Flood claim to Quintillion – over a year after the Flood claim was made – which included Vericlaim's *third* request for the NHTI contract.

75.     On March 16, 2018, Quintillion responded to Vericlaim enclosing the requested information.

76.     After Quintillion received no communication from Ironshore or Vericlaim for another two months, on May 11, 2018 Quintillion sent Mr. Christopher Kelly at Ironshore a letter noting that the Flood claim had been filed in February 2017 – almost 15 months prior – and that Ironshore's failure to provide a timely decision on coverage violates Alaska law, which requires prompt notification to the policyholder once the insurer has reason to believe that a coverage dispute may exist, prompt action by the insurer to ensure that the policyholder is made fully aware of and understands the

potential coverage problem, and that an insurer's unreasonable delay in investigating or deciding a claim exposes the insurer to a bad faith claim and punitive damages.

77.     In response to Quintillion's demand for a coverage decision on the Flood claim, Ironshore sent a letter on May 25, 2018 that neither explained why it was still investigating the claim nor provided a decision on the claim. Instead, Ironshore simply stated that it was proceeding with its claim investigation and that it had retained a civil engineer consultant, Geo Group Northwest, to assist with the investigation - completely failing to acknowledge that it had assigned Geo Group to investigate the Flood Claim more than one year before, or that Geo Group and Quintillion had met in January 2018 to exchange information related to the claim.    Ironshore's letter also identified certain policy provisions that it stated might impact coverage for the claim.

78.     On May 28, 2018, Quintillion sent an email to Vericlaim noting that Geo Group, which been assigned to the Flood claim for over a year at that point, Vericlaim and Quintillion met in January 2018 and had an extensive discussion about the Flood claim at that time. Quintillion also observed that the May 25th letter failed to explain why Ironshore had not yet made a coverage decision or why Ironshore had subjected Quintillion to such a lengthy delay in evaluating the claim. The email ended by asking Ironshore to identify what additional information was needed in order to make a coverage decision swiftly.

79.     After another month elapsed, Ironshore sent a letter on June 27, 2018 reiterating that it was proceeding with its investigation, identifying additional policy

provisions, including a "land and land values" Policy exclusion, that might impact coverage for the claim, and requesting information concerning whether Quintillion had declared contract values, for premium purposes, for costs incurred to move, remove, place or otherwise handle cut, fill and backfill materials.

80.     On July 3, 2018, Quintillion responded, explaining that the policy exclusion Ironshore identified in its June 27th letter specifically states that various costs Quintillion had incurred would be covered, including "labor and material charges incurred to move, remove, place or otherwise handle cut, fill and backfill materials, whether insured or uninsured . . . are covered to the extent such charges are included in the estimated TOTAL CONTRACT VALUE* declared for premium purposes"

81.     Additionally, the original March 30, 2016 Submission by Aon, which was the basis upon which Ironshore wrote and priced the Builder's Risk Policy Quintillion purchased, stated that the Project involved burying cable in the ground 36 inches deep by means of trenching, boring, rock excavation and plowing methods utilizing a variety of earth-moving equipment including bulldozers and backhoes, which plainly encompassed backfilling the excavated trench to a minimum depth of 36 inches *after* the cable was installed in it, and clearly was part of the $25,326,531 total contract value declared for premium purposes.

82.     On August 3, 2018, after another full month passed, Ironshore finally informed  Quintillion that it was denying all coverage for the Flood claim, because "it

appears that there is "no physical damage to covered property under the Policy," which "is a foundational requirement to any coverage under the Policy."

83.     Instead of deciding Quintillion's Flood claim within 30 days, as the AAC regulations contemplate, Ironshore seemingly procrastinated for close to a year and a half before it decided that Quintillion's Flood claim lacked a "foundational requirement" to Policy coverage.

84.     Ironshore determined that the only property damaged was the earthen barrier and groundcover that protected the cable from damage and under which the cable was buried to a minimum depth of 36 inches, as required by the Alaska DOT.

85.     To arrive at this conclusion, Ironshore relied on the following "Land Values" exclusion:

> Land or land values including the value of cut, fill and backfill materials which existed at the project site prior to project commencement; however, to the extent included in the estimated TOTAL CONTRACT VALUE* declared for premium purposes, the value of fill and backfill materials purchased for use in the completion of the INSURED PROJECT* is not excluded. Notwithstanding the foregoing, labor and material charges incurred to move, remove, place or otherwise handle cut, fill and backfill materials, whether insured or uninsured in the foregoing, are covered to the extent such charges are included in the estimated TOTAL CONTRACT VALUE* declared for premium purposes;

See, Exhibit A at 13 (underline added).

86.     Ironshore relied on this identical exclusion to deny coverage for the UTI claim. In both denials, Ironshore refused to consider and apply the underlined language,

which provides an exception to the "land values" exclusion - an exception that expressly gives back coverage that pertains to Quintillion's claims: "Notwithstanding the foregoing, labor and material charges incurred to move, remove, place or otherwise handle cut, fill and backfill materials, whether insured or uninsured in the foregoing, are covered to the extent such charges are included in the estimated TOTAL CONTRACT VALUE* declared for premium purposes."

87.     The labor and material costs Quintillion incurred to repair the Flood damage included costs to move, place and handle fill or backfill materials, thus is covered because these charges were included in the estimated TOTAL CONTRACT VALUE* - regardless of whether the fill or backfill being handled is insured or uninsured. The labor and material costs to move the backfill materials in order to refill the trench after the cable was initially placed in it unquestionably was included in the $25,326,531 estimated TOTAL CONTRACT VALUE* as specified in the Submission and in the NHTI construction contract.

VI.     **Ironshore's Denial of Quintillion's UTI Claim**

88.     On October 9, 2017, Quintillion provided Ironshore with a notice of claim regarding the property damage caused by UTI (the "UTI claim").

89.     On October 10, 2017, Ironshore acknowledged receipt of Quintillion's notice of claim, identifying Christopher J. Kelly as the "Claims Professional [who] has been assigned to this matter for further handling."

90. On December 19, 2017, Mr. Kelly forwarded Quintillion's UTI claim to Vericlaim for processing, and admitted that, prior to that date he was unaware that he had been assigned responsibility for handling Quintillion's October 9, 2017 notice of claim.

91. By failing to take any action on the UTI claim for nearly two months, Ironshore violated 3 AAC § 26.050(a)-(b), which requires insurance companies to "promptly undertake the investigation of a claim [] and shall complete the investigation within 30 working days, unless the investigation cannot reasonably be completed using due diligence." If additional time is needed, insurance companies must "give written notification to the claimant that specifically states the need and reasons for additional investigative time and also specifies the additional time required to complete the investigation [which] shall be given no later than the 30th working day after notification of the claim is first received."

92. Ironshore failed to complete its investigation within 30 working days of receipt of the UTI claim and failed to give written notice to Quintillion that specifically stated the reasons it needed additional investigative time or the amount of additional time it believed would be required to complete the investigation.

93. This initial failure to follow minimum claim handling standards was indicative of Ironshore's pattern of delay, duplicative requests for information and lengthy time periods with no communication whatever that exemplified its handling of Quintillion's claims.

94.     On January 16, 2018, Quintillion hosted a meeting with Vericlaim and the civil engineering consultant that had been assigned to investigate the UTI claim, Geo Group Northwest, in which Quintillion provided detailed information regarding the UTI claim, including an estimate of the cost to repair the damage to the Project.

95.     In an email dated January 16, 2018, Quintillion provided a copy of the NHTI construction contract for the Quintillion Installation Project, as well as all change orders, which had been requested by Vericlaim during the meeting.

96.     Quintillion received no communication from Ironshore or Vericlaim for two more months, then in March 2018, Vericlaim sent a request for information to Quintillion.

97.     The only information requested in Vericlaim's March 2018 letter concerned UTI – an entity with which Quintillion had little involvement, including requests for (1) UTI's installation contract; (2) UTI's landscape restoration standards; (3) agreements between Quintillion and UTI; (4) subrogation agreements between Quintillion and UTI; and (5) UTI's insurance coverage and brokerage.

98.     In addition to the fact that Quintillion would be highly unlikely to have such information regarding a contractor with which it did no business, the information about UTI requested in the March 2018 Vericlaim letter was not relevant to Ironshore's determination whether the damage to the Quintillion Installation Project was covered under the Builder's Risk policy.

99.    After Quintillion received no communication from Ironshore or Vericlaim for another two months, in May 2018, Quintillion sent Mr. Kelly at Ironshore a letter noting that Ironshore's failure to engage in meaningful communication with Quintillion and provide a timely decision on coverage violates Alaska law, which requires prompt notification by an insurer to its insured of its intention to deny liability in order to give the insured reasonable time to protect himself, and that that an insurer's unreasonable delay in investigating or deciding a claim exposes the insurer to a bad faith claim and punitive damages.

100.    In response to Quintillion's demand for a coverage decision on the UTI claim, Ironshore sent a letter on May 25, 2018 explaining that it was proceeding with its investigation and had retained a civil engineer consultant, Geo Group Northwest, to assist with the investigation. The letter also identified certain policy provisions that might impact the claims.

101.    On May 28, 2018, Quintillion sent an email to Vericlaim noting that Geo Group, Vericlaim and Quintillion had met in January 2018 and had an extensive discussion about the UTI claim at that time, and that Geo Group had not requested any additional information since March, when they requested information about UTI that was immaterial to the coverage decision. Quintillion also observed that the May 25th letter failed to explain why Ironshore had not yet made a coverage decision or why Ironshore had subjected Quintillion to such a lengthy delay in evaluating the claim. The email

ended by asking Ironshore to identify what additional information was needed in order to make a coverage decision swiftly.

102.   After another month elapsed, Ironshore sent a letter on June 27, 2018 reiterating that it was proceeding with its investigation, identifying additional policy provisions, including the "land values" exclusion, that might impact coverage for the claim, and requesting information concerning whether Quintillion had declared contract values, for premium purposes, for costs incurred to move, remove, place or otherwise handle cut, fill and backfill materials.

103.   On July 3, 2018, Quintillion responded, explaining that the Policy exclusion Ironshore identified in its June 27th letter specifically states that various costs Quintillion had incurred would be covered, including "labor and material charges incurred to move, remove, place or otherwise handle cut, fill and backfill materials, whether insured or uninsured . . . are covered to the extent such charges are included in the estimated TOTAL CONTRACT VALUE* declared for premium purposes."

104.   Additionally, the original March 30, 2016 Submission by Aon, which was the basis upon which Ironshore wrote and priced the Builder's Risk Policy Quintillion purchased, stated that the Project involved burying cable in the ground 36 inches deep by means of trenching, boring, rock excavation and plowing methods utilizing a variety of earth-moving equipment including bulldozers and backhoes, which plainly encompassed backfilling the excavated trench to a minimum depth of 36 inches *after* the cable was

installed in it, and clearly was part of the $25,326,531 total contract value declared for premium purposes.

105. On August 3, 2018, after another full month passed, Ironshore finally informed Quintillion that it was denying all coverage for the UTI claim, because "it appears that there is "no physical damage to covered property under the Policy," which "is a foundational requirement to any coverage under the Policy."

106. Instead of deciding Quintillion's claim within 30 days, as the AAC regulations contemplate, somehow it took Ironshore almost ten months to recognize that Quintillion's UTI claim was missing a "foundational requirement" to Policy coverage.

107. Ironshore determined that the only property damaged was the earthen barrier and groundcover that protected the cable from damage and under which the cable was buried to a minimum depth of 36 inches, as required by the DOT permit.

108. To arrive at this conclusion, Ironshore relied on the following "Land Values" exclusion:

> Land or land values including the value of cut, fill and backfill materials which existed at the project site prior to project commencement; however, to the extent included in the estimated TOTAL CONTRACT VALUE* declared for premium purposes, the value of fill and backfill materials purchased for use in the completion of the INSURED PROJECT* is not excluded. Notwithstanding the foregoing, labor and material charges incurred to move, remove, place or otherwise handle cut, fill and backfill materials, whether insured or uninsured in the foregoing, are covered to the extent such charges are included in the estimated TOTAL CONTRACT VALUE* declared for premium purposes;

*See*, Exhibit A at 13 (underline added).

109.    Ironshore relied on this identical exclusion to deny coverage for the Flood claim.  In both denials, Ironshore refused to consider and apply the underlined language, which provides an exception to the "land values" exclusion - an exception that expressly gives back coverage that pertains to Quintillion's claims:   "Notwithstanding the foregoing, labor and material charges incurred to move, remove, place or otherwise handle cut, fill and backfill materials, whether insured or uninsured in the foregoing, are covered to the extent such charges are included in the estimated TOTAL CONTRACT VALUE* declared for premium purposes."

110.    The labor and material costs Quintillion incurred to repair the UTI damage included costs to move, place and handle backfill materials, thus is covered because these charges were included in the estimated TOTAL CONTRACT VALUE* - regardless of whether the backfill being handled is insured or uninsured.  Since the labor and material costs to move the original backfill materials to refill the trench after the cable was initially placed in it unquestionably were included in the $25,326,531 estimated TOTAL CONTRACT VALUE*, as specified in the Submission and in the NHTI construction contract, the exception to the "land value" exclusion applies to cover Quintillion's labor and material costs to repair the UTI damage.

VII.    **Ironshore's Claim Denials Violate the Plain Language of the Policy**

111.    TOTAL CONTRACT VALUE* is defined in the Policy as the "total value of all property insured including, but not limited to, all wages, expenses, materials,

supplies, equipment, existing structures (when coverage is included) and such other charges, all whether provided by the owner, contractors or others, which will become a part of or will be expended in the project . . ." Exhibit A at 25. The value of the estimated TOTAL CONTRACT VALUE* declared for premium purposes was $25,326,531 - which is also the Policy limit.

112.    The Submission unequivocally communicated that a major component of the Project involved digging and moving earth, therefore a significant portion of the TOTAL CONTRACT VALUE* covers costs associated with wages, expenses, equipment, supplies and other such charges incurred by the contractor and expended in the project to backfill the trench after the cable was placed in it.

113.    The NHTI construction contract, which Quintillion provided to Ironshore at least three different times - in March 2017, January 2018 and March 2018 –also described the Project scope of work to include:

> [A]ll labor, services, supervision, materials, supplies, fixtures, tools, implements, equipment, transportation and preconstruction services (including estimating, budgeting, scheduling, consultation on materials, constructability, reliability and maintenance) and all other items, construction and services necessary to design, engineer, construct and complete the Project, including all items, construction and services reasonably inferable from this Contract.

Exhibit C at 1.

114.    The "land values" exception provides coverage for "labor and material charges incurred to move, remove, place or otherwise handle cut, fill and backfill

materials, whether insured or uninsured" as long as "such charges are included in the estimated TOTAL CONTRACT VALUE*", which the NHTI contract provision in the foregoing paragraph demonstrates were included.

115.    Even if the fill or backfill that is being used to repair the damage to the Project is not insured, the cost of labor and material to move and handle the fill is explicitly excepted from the exclusion, therefore is covered.

116.    Both the UTI and the Flood claim similarly includes substantial costs related to labor, equipment and material required to move and handle the fill used to repair the damage.

117.    Ironshore's unreasonable delay and unjustifiable denial of Quintillion's UTI and Flood claims constitute a breach of the express terms of the insurance contract.

118.    In unreasonably delaying and unjustifiably denying Quintillion's UTI and Flood claims, Ironshore put its own interests ahead of its insured's interests, and breached its duty  to Quintillion to act in good faith and fair dealing in carrying out its contractual obligations.

<u>**FIRST CLAIM FOR RELIEF**</u>
**(Breach of  Insurance Contract )**

119.    Quintillion incorporates by reference the allegations contained in paragraphs 1 through 118 as if fully set forth herein.

120.    Ironshore entered into a binding written agreement with Quintillion to provide Builder's Risk insurance as described above (the "Insurance Contract").

121.  Quintillion fully performed its obligations under the Policy by paying premiums in full and on a timely basis, and by providing the information Ironshore requested related to the Flood and UTI claims. Quintillion has satisfied any conditions precedent to coverage under the Policies.

122.  Ironshore has materially breached the insurance contract by refusing to perform its obligations under the Insurance Contract.

123.  The refusal by Ironshore to perform is not excused or justified in any manner.

124.  As a result of Ironshore's breach of the Insurance Contract, Quintillion has been damaged and is entitled to recover damages.

## SECOND CLAIM FOR RELIEF
(Bad Faith Breach of Insurance Contract)

125.  Quintillion incorporates by reference the allegations contained in paragraphs 1 through 124 as if fully set forth herein.

126.  Pursuant to AS § 21.36.020, no entity engaged in the insurance business in the State of Alaska may engage in any unfair or deceptive act or practice when conducting the business of insurance.

127.  Ironshore may not engage in any unfair or deceptive act or practice when conducting the business of insurance in the State of Alaska.

128.  Every contract or policy of insurance contains implied covenants of good faith and fair dealing owed by the insurer to the insured.

129. The Insurance Policy sold by Ironshore to Quintillion contains implied covenants of good faith and fair dealing owed by Ironshore to Quintillion.

130. Ironshore owes to Quintillion a duty of good faith and fair dealing in connection with Quintillion's request that Ironshore cover the cost of repair with respect to damage to the Quintillion Installation Project, as required under the Insurance Policy.

131. Pursuant to AS § 21.36.125, "Unfair Claims Settlement Practices Act," Alaska has promulgated statutory standards for the handling of insurance claims, which represent codification of well-established insurance industry standards and prohibit the following acts or practices:

> (a)(1) misrepresenting facts or policy provisions relating to coverage of an insurance policy;
>
> (a)(2) failing to acknowledge and act promptly upon communications regarding the claim arising under an insurance policy;
>
> (a)(3) failing to adopt and implement reasonable standards for prompt investigations of claims;
>
> (a)(4) refusing to pay a claim without a reasonable investigation of all of the available information and an explanation of the basis for denial of the claim or for the offer of compromise settlement;
>
> (a)(5) failing to affirm or deny coverage of claims within a reasonable time of the completion of proof-of-loss statements;
>
> (a)(6) failing to attempt in good faith to make prompt and equitable settlement of claims in which liability is reasonably clear;

(a)(8) compelling an insured or third-party claimants in a case in which liability is clear to litigate for recovery of an amount due under an insurance policy by offering an amount that does not have an objectively reasonable basis in law and fact and that has not been documented in the insurer's file;

(a)(13) delaying investigation or payment of claims by requiring submission of unnecessary or substantially repetitive claims reports and proof-of-loss forms;

(a)(15) failing to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement.

132.    In addition, the Alaska Administrative Code (AAC) contains regulations detailing minimum claim handling standards in Alaska, which impose certain duties and obligations on an insurer in the handling of claims consistent with the claims handling standards cited above, including 3 AAC § 26.050, "Standards for Prompt Investigation of Claims," which require:

(a) Any person transacting a business of insurance who participates in the investigation, adjustment, negotiation, or settlement of a claim shall promptly undertake the investigation of a claim after notification of the claim is received, and shall complete the investigation within 30 working days, unless the investigation cannot reasonably be completed using due diligence.

(b) Unless the notification of a claim is in the form of a suit, demand for arbitration, application for adjudication, or other pleading, or the claim becomes the subject of such litigation within 30 working days, the person transacting the business of insurance shall give written notification to the claimant that specifically states the need and reasons for additional investigative time and also specifies the additional time required to complete the investigation. That notification shall

be given no later than the 30th working day after notification
of the claim is first received.

133.   The foregoing statutes and regulations provide clear and accepted industry

standards by which Ironshore's handling and denial of Quintillion's claims can be

judged.

134.   Ironshore committed unfair and deceptive trade practices and acted in bad

faith as shown in the foregoing allegations.

135.   Ironshore knew, or should have known, that its acts, as shown in the

foregoing allegations, were unreasonable and in bad faith.

136.   Ironshore's unreasonable acts and bad faith misconduct have caused

damage to Quintillion.

## THIRD CLAIM FOR RELIEF
(Declaratory Relief)

137.   Quintillion incorporates by reference the allegations contained in

paragraphs 1 through 136 as if fully set forth herein.

138.   The rights and duties of Quintillion and Ironshore under the Insurance

Policies are governed by the laws of the State of Alaska.

139.   There is an existing controversy between Quintillion, on one hand, and

Ironshore, on the other, concerning Ironshore's duty to cover the costs to repair damages

to the Quintillion Installation Project under the Ironshore Policy.

140. Without resolution by this Court, Quintillion will be subject to uncertainty and insecurity regarding its rights under the Ironshore Policy.

141. Pursuant to 28 U.S.C. §2201, Quintillion is entitled to a declaratory judgment, declaring that Ironshore is required to cover the costs to repair the Project related to the damages that are covered under its Policy.

## **PRAYER FOR RELIEF**

WHEREFORE, the Plaintiff Quintillion demands judgment against:

A. Ironshore for actual, compensatory, and consequential damages in an amount to be proved at trial;

B. Ironshore for non-economic damages in an amount to be determined at trial;

C. Ironshore for pre-judgment and post-judgment interest as allowed by law;

D. Ironshore for costs incurred in pursuing this lawsuit, including attorneys fees, as allowed by Alaska law and A.R.C.P. 82; and

E. For any and all other relief the Court deems proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all claims asserted in this action.

Dated this 13th day of February, 2019.

HOLLAND & HART LLP

/s/ Talitha Birch Kindred
Talitha Birch Kindred, AK Bar No. 0711079
Jonathan W. Katchen, AK Bar No. 0411111
HOLLAND & HART LLP
1029 W. Third Avenue, Suite 550
Anchorage, Alaska 99501
Telephone: (907) 865-2600
Fax: (907) 865-2680
TBKindred@hollandhart.com
JWKatchen@hollandhart.com

*Attorneys for Quintillion Networks, LLC*